This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**No. A-1-CA-37633**

**PAUL MARIO GUGGINO,**

 Worker-Appellant,

v.

**SOUTHWEST PRIMARY LEARNING CENTER; SOUTHWEST INTERMEDIATE LEARNING CENTER; SOUTHWEST SECONDARY LEARNING CENTER; SOUTHWEST AERONAUTICS, MATHEMATICS AND SCIENCES ACADEMY; and NEW MEXICO PUBLIC SCHOOLS INSURANCE AUTHORITY,**

 Employer/Insurer-Appellees.

**APPEAL FROM THE WORKERS' COMPENSATION ADMINISTRATION**
**Leonard J. Padilla, Workers' Compensation Judge**

Law Offices of E. Justin Pennington
E. Justin Pennington
Albuquerque, NM

for Appellant

Allen, Shepherd, Lewis & Syra, P.A.
Kimberly A. Syra
Albuquerque, NM

for Appellees

**MEMORANDUM OPINION**

**B. ZAMORA, Judge.**

**{1}**     Mario Guggino (Worker) appeals from the Workers' Compensation Judge's (WCJ) order denying his claim for workers' compensation benefits. Worker claims the WCJ erred in finding that: (1) Worker failed to provide legally sufficient notice of his claimed work-related injury; (2) Worker's complaint is barred by the statute of limitations; (3) the testimony of Worker's health care provider (HCP) was inadmissible; and (4) Worker did not sustain a compensable injury. We agree with Worker on all points, and therefore reverse and remand for further proceedings consistent with this opinion.

**BACKGROUND**

**{2}**     Worker was employed as the Chief Financial Officer (CFO), for Southwest Learning 2Center (Employer). In February 2014 Worker discovered evidence of several million dollars' worth of fraud and misuse of public funds committed by Employer's Executive Director, Scott Glasrud. Worker informed the Office of the State Auditor (OSA) of the suspected misconduct in the Spring 2014 and the OSA then referred the case to the Federal Bureau of Investigation (FBI). Worker became a confidential informant (CI) for the FBI to help investigate the allegations of fraud against Glasrud in June 2014. Over the course of the next two months, while acting as a CI, Worker provided copies of Employer's documents and financial data to the FBI, and secretly recorded conversations with Glasrud and other suspected employees using a portable device placed in his shirt. During this period, Worker had several hostile encounters with Glasrud, and eventually installed security equipment around his home because he was afraid for his safety and the safety of his family.

**{3}**     Based on the information provided by Worker, the FBI executed a search warrant on Employer's offices on July 30, 2014. Worker testified that during the search, all employees, including Worker, were removed from their workspace and were generally "shocked, dismayed, sense of bewilderment [and] confus[ed]." Defendant was aware that the search was coming and was terrified the day it occurred. In the month following the FBI's search, Worker admitted to Employer that he was the CI. He told Employer that as the CFO, he believed he would be terminated for failing to report and prevent the financial fraud committed by Glasrud. Worker testified that his work environment deteriorated after his disclosure. Employer revoked Worker's access to his computer, severely restricted his ability to operate the finances because he was "unable to create new transactions," and required him to report to several new supervisors. In September 2014 Worker requested six weeks of leave, pursuant to the Family Medical Leave Act (FMLA). Worker never returned to his job and was officially terminated on June 10, 2015. After his termination, and at the recommendation of his primary care physician, Worker attempted to find a counselor but was rejected by several counselors due to his inability to pay the cost of treatment that resulted from his unemployment and pending litigation. Worker finally began treatment with Carol Henry, a licensed professional clinical counselor, in June 2016. Henry diagnosed Worker with Post Traumatic Stress Disorder (PTSD), and on October 14, 2016, Worker filed a Workers' Compensation complaint. The matter proceeded to trial before the WCJ on May 3, 2018.

**{4}** Prior to trial, the WCJ granted Employer's motion in limine to exclude Henry's testimony because she was not an authorized HCP, under NMSA 1978, Section 52-4-1 (2007). Worker then filed an uncontested change of HCP, naming Gerald Fredman, M.D. At the pre-trial hearing, Worker proffered Dr. Fredman's deposition testimony, which had multiple exhibits attached, including deposition testimony from Henry. The WCJ admitted Dr. Fredman's testimony but deferred ruling with respect to admission of all the attached exhibits. Despite admitting Dr. Fredman's testimony at trial, in its findings of fact and conclusions of law, the WCJ sua sponte found that "Dr. Fredman is not a treating HCP, is not an authorized IME provider, and his testimony . . . is hereby ruled inadmissible, along with all exhibits attached thereto." The WCJ also found that Worker had failed to provide notice as required by NMSA 1978, Section 52-1-29(A) (1990), failed to file a claim for benefits within the applicable statute of limitations, and had not suffered a compensable injury, as defined by NMSA 1978, Section 52-1-24(B) (1990). The WCJ dismissed Worker's claim with prejudice.

## DISCUSSION

### I.      Standard of Review

**{5}** "We review workers' compensation orders using the whole record standard of review." *Leonard v. Payday Prof'l*, 2007-NMCA-128, ¶ 10, 142 N.M. 605, 168 P.3d 177. "We will affirm the agency's decision if, after taking the entire record into consideration, there is evidence for a reasonable mind to accept as adequate to support the conclusion reached." *Id.* (internal quotation marks and citation omitted). "The agency's findings will not be disturbed so long as they are supported by substantial evidence on the record as a whole." *Tallman v.* ABF, 1988-NMCA-091, ¶ 15, 108 N.M. 124, 767 P.2d 363. To the extent the WCJ's rulings involved an interpretation and application of the law, we review the WCJ's interpretation of a statute and application of the law to the facts de novo. *Molinar v. Larry Reetz Constr., Ltd.*, 2018-NMCA-011, ¶¶ 19-20, 409 P.3d 956.

### II.     Notice of Worker's Claim

**{6}** Worker argues he provided timely notice to Employer pursuant to the Workers Compensation Act (the Act), because he provided notice once he became aware he had a compensable injury. We agree.

**{7}** The Act requires that a worker "claiming to be entitled to compensation" for an injury must give notice to the employer within fifteen days "after the worker knew, or should have known, of its occurrence[.]" Section 52-1-29(A). "[T]he time period in which notice of a claim must be given begins when the worker recognizes or should recognize the nature, seriousness, and probable compensable character of the injury." *Flint v. Town of Bernalillo*, 1994-NMCA-078, ¶ 12, 118 N.M. 65, 878 P.2d 1014 (internal quotation marks and citation omitted). For a latent injury, "the statutory clock does not start ticking until the worker knew, or should have known by the exercise of reasonable diligence," that his injury was compensable. *Baca v. Los Lunas Cmty. Programs*,

2011-NMCA-008, ¶ 19, 149 N.M. 198, 246 P.3d 1070 (alteration, internal quotation marks and citation omitted). General awareness of work-related "emotional and behavioral problems" is not enough for Worker to know he has a compensable injury. *Flint*, 1994-NMCA-078, ¶ 14.

**{8}** Here, the WCJ found that Worker should have known he had sustained a compensable injury no later than October 16, 2014, when Worker's primary care physician submitted an FMLA certification for "work-related emotional stress." The certification stated that the "stress of work environment" caused "intolerable anxiety [and] depression." We are unpersuaded that this evidence alone established Worker knew he had a compensable injury. We have previously clarified that "layoffs, changes in personnel, and other setbacks" similar to what Worker experienced at the time of the FMLA certification, do not rise to the level of a compensable injury. *Jensen v. N.M. State Police*, 1990-NMCA-007, ¶ 18, 22, 109 N.M. 626, 788 P.2d 382. Notably, Worker and his primary care physician were unaware in 2014 that he had PTSD resulting from the work-related incidents which included the FBI search of the building, hostile confrontations with Glasrud, and the multiple occasions Worker was required to secretly record Glasrud. Instead, Worker became aware that his injury was a compensable injury in September 2016 after his counselor diagnosed him with PTSD.[1] *See Flint*, 1994-NMCA-078, ¶ 14 (observing that "[a]n uneducated worker is not charged with medical knowledge which apparently transcends that possessed by the attending physician," and holding that the diagnosis of PTSD four years after the traumatic event occurred did not bar worker's claim due to notice (internal quotation marks and citation omitted)). And he gave notice to Employer on September 27, 2016, thirteen days after he became aware that he had a compensable injury. We conclude that substantial evidence did not support the WCJ's finding that Worker knew or should have known he had a compensable claim no later than October 2014. *See Flint*, 1994-NMCA-078, ¶ 17 ("We agree with [the worker] that he could not reasonably be expected to know that he suffered from a compensable injury until . . . the date he was first diagnosed with PTSD[.]").

## III.   Statute of Limitations

**{9}** The next issue raised by Worker is whether the WCJ erred in finding that the statute of limitations barred Worker's complaint. The WCJ found that because Worker ceased working in September 2014, he knew of his injury at the latest in October 2014, filed his complaint in October 2016, and therefore failed to file his complaint within the time prescribed by the applicable statute of limitations.

**{10}** Under the Act, a worker has one year from the date of the injury to file a claim with the Workers' Compensation Administration and an additional year which "shall be

---

1Although the WCJ excluded the evidence of Worker's diagnosis of PTSD in September 2016, this exclusion was in error, as we discuss below. Moreover, Employer points to no contradictory evidence. Significantly, Employer concedes that the notice given in September 2016 complied with Section 52-1-29. Therefore, we consider this date accurate for purposes of our analysis as to when Worker knew or should have known that he had a compensable claim.

tolled during the time a worker remains employed by the employer by whom he was employed at the time of such accidental injury, not to exceed a period of one year." NMSA 1978, § 52-1-31(A) (1987). But, the statute of limitations for a latent injury does not begin running until the worker "should recognize the nature, seriousness and probable, compensable character of his latent injury." *Smith v. Dowell Corp.*, 1984-NMSC-091, ¶ 17, 102 N.M. 102, 692 P.2d 27 (internal quotation marks and citation omitted). "Thus, the limitation period [for a latent injury] does not begin until the disability occurs and thereby entitles the worker to benefits under the [A]ct, even if the worker is aware that an injury was suffered earlier." *Lewis v. Albuquerque Pub. Schs.*, 2019-NMSC-022, ¶ 23, 453 P.3d 445. We must determine whether a "worker with a latent injury [should] reasonably recognize the nature and probable, compensable character of the injury, thus activating the running of the statute of limitations." *Smith*, 1984-NMSC-091, ¶ 2. "The important thing is whether the injury was not or could not have been discovered with reasonable diligence." *Letteau v. Reynolds Elec. Eng'g Co.*, 1955-NMSC-103, ¶ 12, 60 N.M. 234, 290 P.2d 1072.

**{11}** As we have noted, Worker first became aware that he had a compensable injury (PTSD) when his counselor diagnosed him in September 2016. *See id.* ¶ 18 (holding that the statute of limitations for worker's claim did not begin until he was advised of the nature of his injury by his doctors). Although Worker continued to visit his primary care physician regularly, several counselors rejected him because of his inability to pay for treatment. No evidence was presented that Worker did not exercise reasonable diligence in trying to find a counselor. Accordingly, we conclude that Section 52-1-31(A) began running in September 2016 when it became "reasonably apparent" that Worker had a compensable injury, and that the WCJ erred in finding that Worker's complaint was not filed within the time prescribed by the statute. *See Smith*, 1984-NMSC-091, ¶¶ 13, 17 (holding that when an earlier doctor had misdiagnosed worker, the statute of limitations did not begin running until a later doctor identified worker's permanent injury).

## IV.  Admissibility of Dr. Fredman's Testimony

**{12}** Worker argues that the WCJ abused its discretion in excluding Dr. Fredman's testimony after the trial in this matter because: (1) Dr. Fredman was an authorized HCP who was properly selected, pursuant to NMSA 1978, Section 52-1-49(C) (1990); and (2) exclusion of Worker's HCP after the conclusion of trial unfairly deprived Worker of the opportunity to establish his claim. We agree with Worker and address each argument in turn.

**{13}** "With respect to the admission or exclusion of evidence, we generally apply an abuse of discretion standard where the application of an evidentiary rule involves an exercise of discretion or judgment, but we apply a de novo standard to review any interpretations of law underlying the evidentiary ruling." *Lewis*, 2019-NMSC-022, ¶ 21 (internal quotation marks and citation omitted). Under the Act, for a physician's testimony to be admissible, the physician must be considered an authorized HCP or an independent medical examiner (IME). NMSA 1978, § 52-1-51 (2013). An HCP includes "any person, entity or facility authorized to furnish health care to an injured worker

pursuant to Section 52-1-49 or -51[.]" 11.4.1.7(J) NMAC. An Employer can "either select the [HCP] for the injured worker or permit the injured worker to make the selection." Section 52-1-49(B). An authorized HCP must have some "experience and familiarity" with the worker for the provider's testimony to be admissible. *See Grine v. Peabody Nat. Res.*, 2006-NMSC-031, ¶ 25, 140 N.M. 30, 139 P.3d 190 (explaining that a doctor's ten minute consultation with a patient is not considered "treatment" because the "expertise of a treating physician is the training, experience and familiarity with the patient").

**{14}** The WCJ admitted Dr. Fredman's testimony immediately prior to trial and only deferred ruling on the exhibits attached to Dr. Fredman's deposition testimony. Despite this, the WCJ issued findings of fact and conclusions of law excluding Dr. Fredman's testimony. The WCJ found that Dr. Fredman "did not agree to treat Worker," concluded that "Dr. Fredman was acting more like an [IME] provider" and excluded the testimony on the grounds that "none of the usual conventions surrounding an authorized IME [were] followed."

**{15}** First, we hold that Dr. Fredman was an authorized HCP because he provided treatment to Worker and Worker properly changed his HCP from Henry to Dr. Fredman. Worker's selection of Dr. Fredman as his HCP followed the statutory requirements. *See* § 52-1-49(C) (stating that "the party seeking . . . a change shall file a notice of the name and address of his choice of [HCP] with the other party"). Worker filed a notice of change of HCP from Henry to Dr. Fredman in November 2017, without objection from Employer. And, the WCJ did not rule to the contrary—that Dr. Fredman was not Worker's HCP. *See* 11.4.4.12(F)(1) NMAC ("If no objection is filed, the HCP declared on the notice of change form shall be designated as the authorized treating HCP[.]"); *see also Grine*, 2006-NMSC-031, ¶ 24 (explaining "[i]f [e]mployer had notice and failed to communicate its HCP selection to [w]orker within a reasonable period of time," worker's choice of HCP is adopted by employer). Additionally, there was evidence that Dr. Fredman treated Worker. For example, Dr. Fredman testified that he agreed to see Worker "for a while" as a "treatment case," formulated a treatment plan for Worker, monitored Worker's medication as part of his treatment, and intended to monitor Worker's progress for at least the next six months following his evaluation. An HCP's familiarity with their patient is the foundation for the admission of their testimony under Section 52-1-51(C). *See Grine*, 2006-NMSC-031, ¶ 25. Because there was testimony that Dr. Fredman had a treatment plan that necessarily required familiarity with Worker and Dr. Fredman was deemed Worker's HCP without objection from the Employer, we conclude that Dr. Fredman was an authorized HCP.

**{16}** Second, the WCJ's decision to exclude Dr. Fredman's testimony at the conclusion of trial, after the evidence was already admitted and ostensibly considered, violates principles of fundamental fairness. *See Lackey v. Darrell Julian Const.*, 1998-NMCA-121, ¶ 20, 125 N.M. 592, 964 P.2d 153 ("When the Act does not provide the explicit answer to the question at issue, fundamental fairness is to be the guide."). We explain. Worker was required to "establish causation through the testimony of a[n] HCP]." *Banks v. IMC Kalium Carlsbad Potash Co.*, 2003-NMSC-026, ¶ 24, 134 N.M. 421, 77 P.3d 1014 (internal quotation marks omitted). Thus, "to exclude the provider's

testimony . . . especially . . . when the worker would be left without alternatives to establish causation of his or her injury[,]" places the worker in an untenable and unfair position. *Id.* ¶ 30. For the reasons demonstrated above, Dr. Fredman's testimony established that he had a treatment plan for Worker and had taken him on as a treating physician. Without Dr. Fredman's testimony, Worker was unable to "establish causation" for his claim of PTSD. *Id.* The WCJ's finding that Dr. Fredman was not an authorized HCP after initially admitting his testimony unfairly violated the established principle that a worker's HCP cannot be excluded after trial. *See id.* (holding that any objections or exclusions of a worker's choice of health care provider should be done earlier in the trial process). Accordingly, we hold that the WCJ's exclusion of Dr. Fredman's testimony was an abuse of discretion.

## V.     The Compensability of Worker's Mental Injury

**{17}** The final issue raised by Worker is whether there was substantial evidence to support the WCJ's finding that Worker did not suffer a psychologically traumatic event under the Act. The WCJ found that Worker did not suffer such an event because the incidents identified by Worker "would not evoke significant symptoms of distress in a worker in similar circumstances."

**{18}** A mental injury is only compensable if it rises to the level of a "primary mental impairment" and must be "an accidental injury" during "the course of employment" that "consists of a psychologically traumatic event that is generally outside of a worker's usual experience and would evoke significant symptoms of distress in a worker in similar circumstances." Section 52-1-24(B). Specifically, we have held that "the [L]egislature intended to allow compensation for mental injuries analogous to those present in cases of PTSD." *Collado v. City of Albuquerque*, 1995-NMCA-117, ¶ 21, 120 N.M. 608, 904 P.2d 57. Dr. Fredman's testimony identified several events during the course of Worker's employment, including the confrontations with Glasrud and the FBI search, that would be generally outside of a worker's usual experience, and which Dr. Fredman testified evoked significant symptoms of distress. Dr. Fredman's unchallenged testimony established that these events were the cause of Worker's PTSD. *See Grine*, 2006-NMSC-031, ¶ 31 (stating that when a doctor's testimony is not contradicted, it should be considered "binding with regard to causation"). Because the WCJ failed to consider this uncontroverted testimony, which we have concluded was an abuse of discretion, we remand for the WCJ to reconsider whether Worker suffered a psychologically traumatic event in light of Dr. Fredman's testimony.

## CONCLUSION

**{19}** We reverse and remand for further proceedings consistent with this opinion.

**{20}    IT IS SO ORDERED.**

**BRIANA H. ZAMORA, Judge**

**WE CONCUR:**

**LINDA M. VANZI, Judge**

**JACQUELINE R. MEDINA, Judge**